IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INTERNATIONAL CAPITAL GROUP, LLC, a Delaware corporation, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | No. 10 C 3257<br>) |
| ED STARRS, an individual, | )<br>) |
| Defendant. | )<br>) |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is defendant Ed Starrs's Motion to Dismiss the amended complaint filed by International Capital Group, LLC ("ICG"). Starrs contends that ICG has failed to state claim against him because the loan agreement between the parties does not impose personal liability under the circumstances. As set forth below, we deny the motion.

**FACTUAL BACKGROUND**

On approximately July 29, 2008, Starrs borrowed $750,000 ("Initial Loan") from ICG pursuant to their Full Recourse Loan and Security Agreement ("Agreement"). (Compl. ¶ 7.) As collateral for the Initial Loan, Starrs transferred certain of his shares in MyEcheck, Inc. (*Id.*) The Agreement provided that this Initial Loan of $750,000 would mature 120 days after funding. (Compl., Ex. A, Agr. § 2.2.) The parties contemplated that at that time, they would enter into a subsequent, non-recourse loan agreement involving the same collateral ("New Loan"), rather than require Starrs to repay the loan at maturity. (*Id.*) No New Loan was executed, however.

ICG alleges that in about June 2009, the collateral securing the Initial Loan depreciated significantly. (Compl. ¶ 11.) Pursuant to § 3.3 of the Agreement, ICG demanded that Starrs put

up additional collateral.  (*Id.* ¶ 12.)  Starrs failed to do so, allegedly triggering a default under the Agreement.  (*Id.* ¶¶ 12–14.)  ICG claims that, although it may sell the collateral to satisfy the Initial Loan obligations, Starrs is personally responsible for any shortfall between the proceeds of such a sale and the outstanding debt.  (*Id.* ¶¶ 15–18; Agr. §§ 8.2–8.3.)  According to the Complaint, Starrs refuses to repay the Initial Loan despite ICG's repeated requests.  (Compl. ¶¶ 17–18.)  Moreover, the collateral lacks sufficient value to satisfy the debt.  (*Id.*)  ICG thus seeks $750,000 from Starrs, plus interest, attorneys' fees and costs.  (*Id.* at 6.)

In his motion, Starrs challenges ICG's right to recovery, arguing that the pertinent provisions cited by ICG simply do not apply.  Starrs essentially contends that because the parties failed to execute a New Loan, different terms governed their relationship—terms that do not impose any personal liability on him.  (*See* Mem. at 4–5; Reply at 3–4.)  Our inquiry will thus focus on the Agreement's specific provisions, which we shall describe and evaluate below.

## STANDARD OF REVIEW

A motion to dismiss is meant to test the sufficiency of the complaint, not to decide the merits of the case.  *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990).  Accordingly, a court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007); *see Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949–50 (2009) (stating that a court's determination "whether a complaint states a plausible claim for relief will . . . be a context-specific task"); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19 (7th Cir. 2007); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776–77 (7th Cir. 2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Although a sufficient complaint thus need not give "detailed factual allegations," it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65; *see Iqbal*, 127 S.Ct. at 1949; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009); *Killingsworth*, 507 F.3d at 618–19. In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 127 S. Ct. at 1949–50; *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602–03 (7th Cir. 2009); *Brooks*, 578 F.3d at 581.

**ANALYSIS**

**I.    The Agreement's Essential Terms**

Pursuant to § 2.2 of the Agreement, Starrs's loan matured 120 days after funding, on approximately November 28, 2008. In their Agreement, the parties clearly and repeatedly expressed their intent to carry Starrs's collateral forward into a New Loan in lieu of repayment at the Initial Loan's date of maturity. (*See* Agr. §§ 2.2, 9.1.) This motion focuses on what terms governed the parties' relationship after they failed to consummate the intended New Loan.

The Agreement explicitly addresses such a situation. Section 2.5 states, as one scenario, that if the parties fail to execute the New Loan but Starrs repays the Initial Loan and any related fees or interest, ICG will release the collateral. (*Id.* § 2.5.) As a second scenario, if the parties fail to execute a New Loan and Starrs does not timely repay the Initial Loan and related costs, ICG "may take full possession of the [c]ollateral and use it for any purposes as set forth in Section 8." (*Id.*) This second scenario came to pass when Starrs declined to repay the loan in

full on or at the maturity date. ICG thus has a right to the collateral and may "use it for any purposes as set forth in Section 8." (*Id.*)

Section 8 governs defaults under the Agreement and describes ICG's remedies in the event of default. (*See* Agr. §§ 8.1–8.3.) Section 8.2 provides, in pertinent part, that ICG "without being required to give any notice . . . may sell any portion or all of any [c]ollateral, the proceeds of which sale shall be applied to the payment of all outstanding debts obligations." (Agr. § 8.2.) It further states that "[a]ny remaining deficiency or shortfall shall be the responsibility of [Starrs], as further specified herein." (*Id.*) Section 8.3 then explains that Starrs "shall be personally responsible" to ICG for any deficiency between the cash proceeds of any collateral sale and his remaining debt. (*Id.* § 8.3(a).)

By Starrs's interpretation, however, the full recourse provisions of §§ 8.2 and 8.3 do not apply. According to Starrs, the Agreement became a non-recourse loan by operation of § 2.5 when the 120-day period expired in November 2008. (Mem. at 4; Reply at 2–3.) In other words, § 2.5 provides that ICG could recover the collateral—but not any further cash repayment from Starrs—if the parties failed to execute a New Loan. (Mem. at 4–5; Reply at 3–4.) Starrs contends that the provisions of § 8 do not apply to these circumstances on the whole; only the reference to selling collateral is effective pursuant to § 2.5. (*Id.*) Section 8.3, moreover, did not survive expiration of the full recourse loan in November 2008.

Boiled down, the question posed is whether § 2.5's cross-reference to § 8 identifies ICG's ability to repossess and use the collateral as its *sole* remedy, as Starrs insists, or whether it leaves § 8 operative in its entirety, including the latter portion of § 8.2 as well as § 8.3, both of which enable ICG to look beyond the collateral and collect personally from Starrs for the alleged

2009 default.

## II. Contract Interpretation

Our analysis of this question is guided by basic principles of contract interpretation. When construing a contract under Illinois law,[1] we examine the agreement as a whole, according to its plain, ordinary, and prevalent meaning. *Bourke v. Dunn & Bradstreet Corp.,* 159 F.3d 1032, 1038 (7th Cir. 1998); *see also Wooley v. Jackson Hewitt, Inc.*, 540 F. Supp. 2d 964, 979 (N.D. Ill. 2008). Moreover, we give effect to all of the contractual terms, harmonizing them and rendering them internally consistent to the extent possible. *LaSalle Nat'l Trust v. ECM Motor Co.*, 76 F.3d 140, 144–45 (7th Cir. 1996); *AGT Crunch Chi., LLC v. 939 N. Ave. Collection, LLC*, No. 07 C 2986, 2008 WL 753951, at *3 (N.D. Ill. Mar. 18, 2008).

Following Illinois courts' "four corners" rule for contract interpretation, the threshold inquiry is whether the contract is ambiguous. *See Bourke*, 159 F.3d at 1036; *Ford v. Dovenmuehle Mortgage Inc.*, 273 Ill. App. 3d 240, 245, 651 N.E.2d 751, 754 (1st Dist. 1995); *see also Hillenbrand v. Meyer Med. Group, S.C.*, 288 Ill. App. 3d 871, 876, 682 N.E.2d 101, 104 (1st Dist. 1997). "An instrument is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning," even when considering the disputed language in the context of the entire agreement. *Bourke*, 159 F.3d at 1038 (quoting *Flora Bank & Trust v. Czyzewski*, 222 Ill. App. 3d 382, 388, 583 N.E.2d 720, 725 (5th Dist. 1991)). However, a "contract is not rendered ambiguous simply because the parties do not agree on the meaning of its terms." *Id.* If we find a contract ambiguous as to the parties' intent, "the interpretation of the

---

[1] Based on the Agreement's choice of law provision, we assume that Illinois law governs. (Agr. § 19.1.) Neither party asserts otherwise.

language is a question of fact which a . . . court cannot properly determine on a motion to dismiss." *Quake Constr., Inc. v. Am. Airlines, Inc.*, 141 Ill. 2d 281, 288–89, 565 N.E. 990, 994 (Ill. 1990); *see Dawson v. Gen'l Motors Corp.*, 977 F.2d 369, 373 (7th Cir. 1992). To the contrary, our interpretation of an unambiguous contract is a question of law. *Bourke*, 159 F.3d at 1036; *Facility Wizard Software, Inc. v. SE Tech. Servs.*, 647 F. Supp. 2d 938, 946 (N.D. Ill 2009); *see First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002). With these principles in mind, we turn to the Agreement.

Starrs contends that the language of § 2.5—stating that ICG " may take full possession of the [c]ollateral and use it for any purposes as set forth in Section 8" if Starrs fails to repay the loan and no New Loan exists—converted the Agreement from a full recourse contract to a non-recourse contract. (Mem. at 5; Reply at 1, 3–4.) We cannot agree with Starrs that the generic reference to § 8 found in § 2.5 thus transforms what is plainly a recourse agreement (by its very title, no less) into something drastically different. The parties intended the *New Loan* to be a non-recourse agreement, but nowhere does the Agreement explicitly provide, or even suggest, that its own nature would change if no New Loan was consummated.

Moreover, Starrs's interpretation accepts much of § 8.2 and then renders its last line, as well as §§ 8.3 and 8.4, completely meaningless after the 120-day maturity period. This construction guts ICG's remedies for any default—such as the default alleged here—for the remaining life of the Agreement. Although Starrs implies that the contract expired and/or converted after 120 days, the Agreement continues in full force until the Initial Loan "has either been paid in full, or has been recapitalized pursuant to an alternate loan agreement, at [ICG's] sole discretion." (Agr. § 14.) We find it implausible that the parties would include detailed

security and recourse provisions in the Agreement—including those found in §§ 2.1.3, 2.3, 3.3, 3.5, 7.3 and 8—only to have those terms expire early on in their relationship.[2] The language of § 2.5 simply does not support Starrs's interpretation. Although we need not look outside the four corners of the Agreement at this time, we add that Starrs's proposed interpretation is also at odds with the plain language of the parties' Promissory Note attached as Exhibit A to the Agreement. (*See* Agr. Ex. A, Note at 20 ("To the extent that the underlying collateral given to secure the [Initial] Loan . . . is insufficient to satisfy the entire Loan amount, [Starrs] remains personally liable for any shortfall or deficiency.").)

Accordingly, we reject Starrs's forced reading of the Agreement. We find the contract to be unambiguous and accept ICG's reasonable, common sense interpretation. Section 2.5 grants ICG the right to seize and sell the collateral under certain circumstances, as here. ICG otherwise would not have the right to do so in the absence of a default; after all, the failure to execute a New Loan coupled with Starrs's election not to repay the Initial Loan does not constitute a default under either § 2.5 or § 8. The parties thus intended § 2.5 to protect ICG's interests in that situation. Section 8, however, is entirely distinct and remains in effect until the contract is terminated, governing any potential default by Starrs—regardless of whether he has yet repaid the Initial Loan under § 2.5.[3] In this lawsuit, ICG alleges that Starrs committed an act of default,

---

[2] Moreover, under Starrs's interpretation, the parties preemptively agreed to convert the Agreement into a non-recourse contract at the very time that they might be realizing that the relationship was not going well, because they had failed to consummate a New Loan. (Agr. § 2.5.) This interpretation defies common sense.

[3] The Agreement thus contemplates a third scenario not alleged here, where the parties failed to reach a New Loan, Starrs has not repaid the Initial Loan, but no default has occurred. Under that scenario, only § 2.5—but not § 8—would be implicated.

thus triggering its rights under § 8.[4] (Compl. ¶¶ 12–14.) We conclude that the Agreement is unambiguous, and ICG has stated a claim thereunder.[5]

## CONCLUSION

For the reasons set forth above, we deny Starrs's motion to dismiss. It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Date: January 10, 2011

---

[4] ICG is not claiming that Starrs's failure to repay the Initial Loan at maturity, in absence of the New Loan, was itself a default.

[5] The parties did not adequately address Starrs's challenge to ICG's unjust enrichment claim. Therefore, particularly given our ruling above, we decline to address the sufficiency of that claim at this time. The unjust enrichment claim thus remains pending.